Filed 1/22/16  P. v. Cage CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068513 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1203340) |
| MARVIN DESHAWN CAGE et al., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, Eric M. Nakata, Judge.  Affirmed as modified, remanded for resentencing.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Marvin Deshawn Cage.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant Tobias Antonio Dunn.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Marvin Deshawn Cage and Tobias Antonio Dunn (Cage and Dunn, together Appellants) of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1); attempted first degree murder (§§ 664, subd. (a)/187, subd. (a); count 2); and street terrorism (§ 186.22, subd. (a); count 3). With respect to counts 1 and 2, the jury found true that a principal personally and intentionally discharged a firearm, causing death to the victim (§ 12022.53, subds. (d) & (e)(1)); a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)); and as to count 2, a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)). The jury also found that Appellants committed the offenses in counts 1 and 2 for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1)(C).)

In a bifurcated proceeding, the trial court found true that Dunn sustained a prior serious or violent felony conviction (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i) & 667, subd. (a)(1)), and had served a prior prison term (§ 667.5, subd. (b)). The trial court also found true that Cage had sustained two prior strike convictions (§§ 1170.12, subds. (a)-(d), & 667, subds. (b)-(i)), two serious felony convictions (§ 667, subd. (a)(1)), and served four prior prison terms (§ 667.5, subd. (b)).

The trial court sentenced Cage to prison for 170 years to life plus 22 years. The trial court also sentenced Dunn to prison for 130 years to life plus 10 years.

_____

[1]     Statutory references are to the Penal Code unless otherwise specified.

Appellants appeal, contending the trial court prejudicially erred in: (1) allowing certain hearsay evidence to be admitted at trial; (2) allowing an expert witness to testify that another witness was afraid of Appellants and scared while testifying; and (3) sentencing both Appellants based on a finding they personally used a firearm when the jury made no such finding. In addition, Cage argues that substantial evidence does not support his conviction for murder, attempted murder, and street terrorism. And Dunn asserts the trial court improperly instructed the jury on the elements of street terrorism and his trial counsel was constitutionally ineffective. We agree with Appellants that there was no finding that either of them personally used a firearm and the trial court improperly sentenced them, apparently assuming there was such a finding. However, we determine that the rest of Appellants' claims are without merit or, even if the trial court erred, Appellants were not prejudiced. As such, we affirm the judgment as modified and remand the matter to the superior court for resentencing.

FACTUAL BACKGROUND

Prosecution

Appellants were members of the Poccet Hood Compton Crips criminal street gang. Deshon Douglas was a member of the Front Hood criminal street gang and rival of Poccet Hood. The rivalry was violent, and if two rival gang members encountered each other on the street, they usually physically fought or, if they had guns, shot each other.

Douglas was engaged to Tamara Payton, and they were living together for six months prior to Payton's death. Around November 24, 2012, Douglas was washing Payton's car in their driveway on Serrano Road in Apple Valley when he noticed Cage

3

parked at the curb in his grey Buick Park Avenue. As Douglas approached the car, Cage drove away.

A day or two later, Douglas and Payton were at Grand Liquor store in Apple Valley. Douglas saw Dunn sitting in the backseat of Cage's car and a woman sitting in the front passenger seat. Inside the store, Douglas ran into Cage. Cage started laughing or smirking, and yelled to Dunn, "He's one of them boys." Dunn got out of the car and walked toward the door of the liquor store, but did not say anything to Douglas. Cage asked Douglas where he was from. Douglas responded, "You know where I'm from." Cage then said, "I'm from Poccet Hood. They call me Monster."

Douglas returned to his car and drove away with Payton. As they were driving, Cage drove up behind them and acted like he was going to hit their car. Douglas wanted to get out of his car, but Payton persuaded him to stay in the car and keep driving. After they turned on Highway 18, Cage started swerving his car towards Douglas's, again acting like he was going to hit Douglas's car. Douglas sped up, and Cage turned on to another street.

On November 27, 2012, Douglas and Payton were getting ready to go to Long Beach when Douglas realized the gas tank on Payton's car was leaking because someone had stabbed it. Douglas and Payton thought James Ware might be responsible for the punctured tank because Douglas and Ware had fought a few days earlier. Douglas and Payton drove to AutoZone to get items to fix the tank. As they were driving, they saw Cage driving in the opposite direction. Dunn was in the front passenger seat. Cage swerved as if he was going to drive across the road, but then continued driving.

4

Around 5:00 p.m., when Douglas and Payton returned from AutoZone, Douglas saw someone by the side of their house. Douglas drove up the 135-foot long driveway and parked the car. Unbeknownst to Douglas, Cage and Dunn had driven to Serrano Road with their friend Parrish Duren.[2] Cage had told Duren that they needed to go take care of business, and Cage and Dunn each grabbed handguns from under their seats and walked toward Douglas and Payton's home. Cage had a nine-millimeter handgun, and Dunn had a .380 caliber handgun. Duren got in the driver's seat of Cage's car and turned it around to await their return.

As Douglas exited the car, Dunn began running toward him with a gun. Dunn began shooting at him. Cage was standing near the end of the driveway. Douglas ran to the passenger side of the car and threw Payton to the ground, trying to cover her. When Dunn got close enough, he kicked Douglas off of Payton and shot her several times. Dunn then ran back down the driveway. Holding guns in their hands, Dunn and Cage returned to Cage's car, and Duren sped away. One of Douglas's neighbors saw the car as Appellants fled, although the neighbor thought it was a Buick LaSabre, which is similar to a Buick Park Avenue.

After the shooting, Douglas ran to his next door neighbor's house and asked her to call 911. She had heard Payton's car drive up and then about three gunshots. Other neighbors heard four to six gunshots, and then heard Douglas yelling for help. They

---

[2]     Duren pled guilty to voluntary manslaughter with a gang enhancement and received a 16-year prison sentence.

5

called 911 and went over to assist. Emergency personnel arrived and began attending to Payton.

San Bernardino County Sheriff's Deputy Bryan Faylor responded to the scene and spoke with Payton while she was in the ambulance. Faylor asked Payton if she knew the identity of the shooter. She said she could not be certain because it was dark. Payton explained that she had some problems with an old roommate, Ware, who was upset because she made him move out. She repeated that she could not be sure who shot her because it was dark.

San Bernardino County Sheriff's Deputy Jonathan Cahow spoke with Payton at the hospital. Cahow asked Payton if she knew who shot her, or if there was anything going on in her life that would make her think someone wanted to attack her. Payton did not know who shot her. In response to the second part of his question, she said she recently had separate issues with Ware and Cage. Payton said Ware was upset because she made him move out. With respect to Cage, Payton relayed that Cage wanted to date her and that he had been stalking her for a while. Payton told Cahow about the recent encounter between Douglas and Cage at the liquor store. Payton also said the shooter was a skinny African-American male who she thought looked like one of the people in the car with Cage at the liquor store. Payton did not know why Cage would want to shoot her.

Payton ultimately died as a result of her gunshot wounds. She was shot multiple times.

At the crime scene, Faylor found three .380 caliber shell casings. One was near the left side of where the driveway turned, one was found on the passenger side of a

6

parked El Camino, and the third was just off the driveway in the dirt. He also found a .380 caliber bullet. The driver's side trunk of Payton's car was marked by a ricochet from a bullet.

Douglas suffered two gunshot wounds, but they did not prove fatal. Douglas initially declined to identify Dunn as the shooter because he intended to retaliate personally. At the trauma center, he described the shooter as an African-American male wearing a black hoodie sweatshirt and black pants. He did not identify anyone at that time. He described an incident with Ware, a former roommate, which occurred a few days before the shooting. At the hospital, Douglas told law enforcement that the shooter was "AK" (Ware), and that the second person was too far away to identify.

San Bernardino County Sheriff's Deputy Joseph Steers subsequently searched Cage's car. Inside of the car, Steers found a baseball cap with the letter "P" on the front. Steers also found a pair of black gloves in a pouch on the back of the driver's seat.

Steers interviewed Dunn around December 21, 2012. Dunn admitted he was in the High Desert area around the time of the shooting. Dunn said he did not know Payton, but he had heard her nickname "Snickers." Dunn admitted he was a Poccet Hood gang member. Dunn said his gang's rivals included Front Hood, and acknowledged that his "PK" tattoo stood for Piru killer. At first Dunn denied any involvement in Payton's murder. His story later changed and he admitted he was present when the murder occurred. Dunn claimed that he acted as the lookout during the shooting, and denied being the shooter. Dunn also initially said Duren was not there, but later said Duren was

7

in the backseat and then became the getaway driver. Dunn identified both Duren and Douglas in photographs.

Dunn also explained to Steers the various references to his gang on his Facebook account, which was under the name "Dig 'Em Dulow." Dunn explained that the post "FHK," stood for Front Hood Killer. "L36K" meant Largo Varrio 36 Killer, and "AFK" stood for Acacia Spook Town and Farm Town Killer. Dunn noted that the post, "PH Gang or don't bang, Fish head hunting, SSKNOT, basking, and ATF killas, knockin' down Lagos," meant Poccet Hood gang or don't bang. Fish head is a derogatory term for Front Hood, and Front Hood hunting as well as SSKNOT were disrespecting South Side Compton Crips. "Phucc 'em all" meant "fuck 'em all" – Crips do not use a "c" and "k" together because it means Crip killer.

Cage also agreed to be interviewed. Cage told detectives that he drove a 1994 Buick Park Avenue that was unique in color because sometimes it looked grey and other times blue. Cage said that he and Payton were casual sex partners even though he knew Payton had a boyfriend from Front Hood. Cage described the encounter with Douglas at the liquor store as friendly. Cage said Douglas asked Cage where he was from, and Cage was surprised by this question because everyone knew about Cage and his family's status with Poccet Hood.

Regarding the day of the shooting, Cage went about his normal activities including getting off work around 3:00 p.m. and getting home around 4:00 p.m. Cage heard about the shooting about 30 minutes after it occurred from his cousin. Cage recited two different stories about where he was when he received the call from his cousin. First, he

8

said he was driving in the vicinity of the shooting when he received the call. He then said he was traveling from Victorville to his aunt's house on Rim Rock, which also was in the general vicinity of where the shooting occurred.

Cell phone records showed that Cage's cell phone was used in the vicinity of the murder at the approximate time of the murder.

Los Angeles County Sheriff's Sergeant John Ganarial and Faylor testified as gang experts. Poccet Hood aka Corner Poccet is a criminal street gang located in Compton that is associated with the Crips. The common color for the gang was blue, and the gang's common signs or symbols include the letters "PH" and "PHCC." Poccet Hoods members often wear Pittsburgh Pirates clothing because of the "P" emblem.

In November 2012, the gang had over 100 members. The gang's geographic area included Wilmington Avenue on the west, El Segundo to the north, Willowbrook to the east, and Stockwell to the south. Nord Street was a street that ran through their territory. Poccet Hood's rivals included Front Hood, Compton Crips, Lagos, and it also did not get along with any Blood or Piru gangs. Poccet Hood's rivalry with Front Hood was long standing and at times, could be violent. The gang's primary activities were shootings, weapons possession, murder, robbery, burglaries, vandalism, and narcotics. Ganarial discussed three predicate offenses committed by Poccet Hood gang members, a June 7, 2010 robbery; a July 1, 2010 murder; and possession of a firearm on July 4, 2009.

Ganarial viewed photographs of tattoos on Dunn and Cage. The first photograph was a tattoo on the chest of Dunn of "PK" and "BK," with the "P" and "B" crossed out. Ganarial explained that Crips often crossed out these letters to show disrespect to the

9

Bloods and Pirus. The next tattoo on Dunn was "PHIP" with the "P's" crossed out. The tattoo meant Poccet Hood In Peace, a sign of respect for the fellow Poccet Hood gang members who have died. Dunn also had a tattoo that said "Compton Crip" with the "P's" crossed out. Cage's tattoo's included "Poccet" and "CC," and "Nord Street" on his arms. Faylor opined that Cage and Dunn were both Poccet Hood gang members.

Faylor explained the importance of respect and reputation in gangs. Faylor opined that the crimes in this case were committed for the benefit of and in association with a criminal street gang. There were two gang members from the same gang, and it benefited the gang because it boosted their reputation, and placed fear and intimidation in the community and as to rival gangs.

Faylor also testified that there was a problem with gang cases and gang members testifying against each other. Faylor explained that Douglas's testimony regarding wanting to retaliate himself and not get law enforcement involved was normal in the gang culture. The prosecutor asked Faylor if Duren had a reason to not want to testify against Cage and Dunn. Faylor said, yes, because Duren felt like a snitch and was fearful. Faylor opined that as he watched Duren on the witness stand, Duren appeared afraid. Faylor observed Duren looking at the prosecutor and answering the questions, and then looking at Cage and Dunn and backpedaling and claiming either he did not know the answer, or that he gave a false statement. In addition, when Faylor transported Duren back to custody after he testified, Duren expressed how terrified he was of Cage and Dunn.

10

Defense

At trial, Appellants focused on the prosecution's failure to prove its case. To this end, they both pointed out that the prosecution's key percipient witnesses, Douglas and Duren, were not credible.

For example, Douglas never told the police that Cage was the shooter. When Douglas received treatment at the trauma center after he was shot, Douglas described the shooter as a black male wearing a black hoodie and black pants. He told the officer he could see another person, but he was too far away to identify the person.

Contrary to his trial testimony, Douglas had previously told a couple people that the shooter was Ware. Ware was a former roommate of Douglas and Payton. He also explained that on Thanksgiving, he had an altercation with Ware after discovering Ware stole things in the house. Douglas wanted Ware out of the house and told him he had to leave. After the fight, Ware told Douglas: "It ain't over. . . . You ain't the only one with guns. I got guns, too." Douglas told the police about the incident with Ware and said Ware was the person who shot Payton and Douglas.

After Douglas told the police that Ware was the shooter, Ware was arrested. Douglas admitted that did not want the shooter apprehended because he wanted to personally retaliate. Douglas also testified that he talked about the incident with Ware, and after doing so, he told the police that the shooter was Dunn.

At trial, Appellants also emphasized that Duren testified that he was lying when he told detectives that he rode with Appellants in Cage's car to "take care of business" with Douglas and Payton and served as the getaway driver. Instead, Duren said that he was

11

pressured to tell the detectives that he played a role in Payton's murder because he wanted to avoid a prison sentence of 50 years to life, which is what he claimed law enforcement told him he would receive if he did not testify at Appellants' trial. During cross-examination, Duren testified that he was not present during the shooting, had no idea what happened or the identity of the shooter, or if either Cage or Dunn was involved.

DISCUSSION

I

*THE ADMISSION OF WARE'S HEARSAY STATEMENTS*

During cross-examination of Douglas, Dunn's trial counsel established that Douglas had talked to Ware on the telephone after Payton was killed. Dunn's counsel asked Douglas about the content of that conversation. Douglas replied, "He told me that he didn't have nothing to do with it. He said he didn't have nothing to do with the shooting." Cage's trial counsel objected on hearsay grounds. The trial court overruled the objection, stating, "He's answering counsel's question. And that question called for hearsay, but he nevertheless asked it. I'm going to let it in." Douglas admitted that after this conversation with Ware he implicated Cage and Dunn in Payton's and Douglas's shooting.

Douglas's testimony about what Ware said to him during their telephone conversation is hearsay. It was an out-of-court statement offered for the truth of the matter that Ware was not the shooter. (See Evid. Code, §1200, subd. (a).) Indeed, the trial court admitted as much, but inexplicably allowed the evidence to be admitted over objection. At trial, there was no discussion of any exception that would allow this

12

hearsay to be properly admitted.  The People offer no argument that the evidence was admissible beyond their contention that Dunn's trial counsel asked the question that elicited the hearsay.  Finding no exception that would allow Douglas's testimony about what Ware said to be admissible, we determine that the court abused its discretion in overruling Cage's trial counsel's hearsay objections.  (See *People v. Alvarez* (1996) 14 Cal.4th 155, 201.)

Having found error, we next consider whether it was prejudicial.  If admission of the hearsay statements violated a state statute alone, we apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, and reverse only if there is a reasonable probability of a result more favorable to the defendant in the absence of the error.  (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [*Watson* standard applicable to state law error in admission of hearsay].)  If, on the other hand, the error violated Appellants' confrontation clause rights, we must determine whether the error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Cage and Dunn both claim that admission of Douglas's testimony regarding Ware's statement violated their constitutional rights to a fair trial.  The People counter, arguing Appellants waived their constitutional claim of a denial of confrontation by failing to make that specific objection at trial.  We need not resolve this dispute because we determine that the subject error was harmless under either the *Chapman* or *Watson* standard.

There was strong evidence that Dunn was the shooter.  Although Douglas initially said it was Ware, he admitted it was actually Dunn and testified accordingly at trial.

13

Duren's account of what happened that night corresponded with Douglas's trial testimony. During an interview with Steers, Dunn acknowledged he was at the scene, but he minimized his participation in the crimes. Dunn corroborated Duren's statements about Duren first being in the backseat of the car, and then being the getaway driver.

Before she died, Payton told Cahow that the shooter looked like the person who was in the car when Douglas had the encounter with Cage at the liquor store. Dunn was in the backseat of Cage's car that day. Shell casings found at the scene were .380 caliber; the same caliber of the gun possessed by Dunn when he got out of and returned to the car. Duren's description of what Dunn was wearing, a black hoodie, was corroborated by Douglas's testimony.

As with Dunn, the evidence of Cage's guilt is compelling. Douglas also was a rival gang member of Cage. The two had several recent hostile encounters leading up to the shooting, including Cage parking his car in front of Douglas and Payton's house, Cage challenging Douglas at the liquor store, and Cage repeatedly driving in a threatening manner. In addition, there is evidence that Cage had some type of relationship with Payton. Payton told police that Cage wanted to date her and had been stalking her. Cage claimed that they had been lovers.

Cage's accomplice, Duren, directly implicated Cage (as well as Dunn) in the shooting. Further, a neighbor saw a car similar to Cage's leaving the scene with its lights off, implying that the driver was trying to avoid detection, and Cage's cell phone records placed him near the site of the shooting around the time of the shooting. Finally, the fact

14

that Cage and Dunn are members of the same gang and hung out together further implicated both of them in the crimes.

The overwhelming evidence established that Dunn was the shooter and Cage aided and abetted Dunn in killing Payton and shooting Douglas. As such, any error in admitting Ware's statements was harmless beyond a reasonable doubt.

Similarly, we are not persuaded by Dunn's claim that his trial counsel was ineffective because he did not request a limiting instruction prohibiting the jury from considering Ware's statements for the truth of the matter asserted. To show that trial counsel's performance was constitutionally defective, an appellant must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) the "deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349 (*Ray*); *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.) We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 (*Lucas*); see *Ray*, *supra*, at p. 349.)

Dunn's claim of ineffective counsel arises from his trial counsel's failure to request a limiting jury instruction. However, we generally defer to the tactical decisions of trial counsel. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212; *People v. Holt* (1997) 15 Cal.4th 619, 703.) "[T]here is a 'strong presumption that counsel's conduct falls within

15

the wide range of reasonable professional assistance.' " (*Lucas*, *supra*, 12 Cal.4th at p. 437, quoting *Strickland*, *supra*, 466 U.S. at p. 689.)

In his opening brief, Dunn suggests his counsel may have asked Douglas about the content of his telephone conversation with Ware for the nonhearsay purpose of trying to show that although Douglas believed Ware was the shooter, the two had reached an agreement to blame someone else to allow Douglas and Ware to settle the matter on their own. Although Douglas's testimony ultimately did not support Dunn's trial counsel's theory of defense, it was the trial counsel's strategic decision to make as to the appropriate extent of cross-examination. (See *People v. Freeman* (1994) 8 Cal.4th 450, 490.)

Also, it may very well be that Dunn's trial counsel had a solid, tactical reason for not requesting a limiting instruction. Although counsel's question called for hearsay, counsel may have been expecting a different answer. Request for a limiting instruction may have called undue attention to Ware's statement. "A 'reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053, quoting *People v. Maury* (2003) 30 Cal.4th 342, 394.) On the record before us, we simply cannot reach the conclusion that no rational tactical purpose existed for Dunn's trial counsel's failure to ask for a limiting instruction. (*Lucas*, supra, 12 Cal.4th at pp. 436-437; *Ray*, *supra*, 13 Cal.4th at p. 349.)

Additionally, even if we were to find that Dunn's trial counsel's representation of Dunn was deficient, Dunn's claim of ineffective counsel fails because he cannot show

16

prejudice.  As we discuss above, the evidence against Dunn was extremely strong and the admission of Ware's hearsay statements did not prejudice his defense.

## II

## *THE EXPERT WITNESS'S OPINION THAT DUREN WAS AFRAID*

Appellants claim that the trial court prejudicially erred when it permitted Faylor to testify that Duren was afraid of Appellants and scared to testify.  We agree that the trial court erred in allowing Faylor to testify regarding Duren's fear of Appellants and testifying, but such error was harmless.

At trial, the prosecutor asked Faylor whether there was a reason why Duren "may or may not have wanted to testify against Mr. Cage and Mr. Dunn."  Dunn's trial counsel objected on grounds of speculation and lack of foundation when Faylor responded:

> "Absolutely, I think that in Mr. Duren's case he is more fearful, feeling like a snitch.  It's said many times the saying 'Snitches get stitches,' or 'Snitches get stitches or end up in ditches.'  And they kind of live by that code.  As a codefendant initially in the case, he really felt as a snitch that he was going to tell the truth and tell on other people that participated in the crime with him.  And as he — as I sat here and watched him on the stand, he was deathly afraid."

The trial court overruled the objection and stated that this was "an opinion of a gang expert."  Then the prosecutor asked Faylor to elaborate further.  Faylor responded:

> "My personal opinion was — during [Duren's] testimony I was seated directly behind the defendants, and what I noticed was as he would be direct with you and answer your questions. . . .  He would answer those questions.  The second that he would look over to the defendants and make eye contact with them is when he would backpedal and start to say, I don't know.  I said those things but they were false statements.  And I watched that interaction between you, [the prosecutor], and as he looked over to the defendants becoming scared.  That evening I transported Mr. Duren back to the jail and we

17

had a discussion about that. And he told me how terrified he was of the defendants Marvin Cage and Tobias Dunn."

The People argue that the trial court did not err in admitting Faylor's opinion, likening the instant matter to *People v. Gonzalez* (2006) 38 Cal.4th 932 (*Gonzalez*). The People's reliance on that case is misplaced.

In *Gonzalez*, the expert witness "merely answered hypothetical questions based on other evidence the prosecution presented, which is a proper way of presenting expert testimony." (*Gonzalez, supra*, 38 Cal.4th at p. 946.) The court noted "[t]he witness did not express an opinion about whether the particular witnesses in this case had been intimidated." (*Id*. at p. 947.) Here, in contrast, Appellants do not complain about Faylor offering an opinion in response to hypothetical questions. Instead, Appellants emphasize that Faylor offered an opinion that a specific witness (Duren) was afraid of Cage and Dunn and afraid to testify against them. As such, Appellants contend Faylor's opinion implied that Duren was lying when he stated he was not with Appellants when Payton and Douglas were shot. We agree that Faylor was not providing an opinion based on a hypothetical question, but instead, offered his opinion based on his observation of a specific witness at trial. *Gonzalez* therefore is inapplicable.

A gang expert may testify on the culture and habits of criminal street gangs. (*Gonzalez, supra*, 38 Ca1.4th at p. 944; *People v. Ward* (2005) 36 Ca1.4th 186, 210-211.) For example, a gang expert may render a general opinion regarding the gang practice of intimidating any gang member willing to testify at a criminal trial. (*Gonzalez, supra*, at pp. 944-945.) From this kind of gang culture testimony, a jury may infer that a particular

18

gang witness who has changed his story is lying. (*Id*. at p. 947.) However, an expert witness may not testify about a specific witness at trial and ultimately offer an opinion about his or her credibility. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1047 ["Obviously, there is a difference between testifying about specific persons and about hypothetical persons."].)

We see little difference between an expert witness offering an opinion that states that a specific witness was afraid to testify and thus lying during his testimony and offering an opinion as to the guilt of a defendant. "A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

Here, Faylor's opinion that Duren was afraid to testify as well as Faylor's explanation that Duren was lying during trial was not helpful to the jury. The jury is as competent as Faylor to weigh the evidence and determine if Duren was credible. Indeed, this is the jury's role. (See *People v. Jones* (1990) 51 Cal.3d 294, 314 [At trial, "it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth and falsity of the facts on which that determination depends."].) Thus, we determine that the trial court abused its discretion when it allowed Faylor to testify directly that Duren was afraid of Appellants and was afraid to testify against them.

19

Ironically, however, because Duren was so obviously afraid of Appellants and testified as such, we conclude Faylor's improperly admitted opinion was not prejudicial. When Duren first began to testify at trial, he admitted that he was scared to testify and did not want to be a witness. He explained that he was worried that he would "either get beat up or killed" for testifying. Then, on direct examination, Duren acknowledged that he told the detective that he was the driver of Cage's car and was with Appellants on the date Payton and Douglas were shot. He also admitted that he told the detective that Appellants had guns, exited the car with those guns, Duren heard shots fired, and Appellants returned to the car and Duren drove away with them. However, he told the prosecutor that he was lying when he provided his statement to the detective. Duren then admitted that if he testified at trial and affirmed what he had told the detective then he could be "beat up or killed."

On cross-examination, Duren then said he was only testifying to avoid a longer sentence and he had no idea who shot Payton or Douglas.

On redirect examination, Duren admitted that in gang culture, he would "get hurt real bad" if he identified the shooter at trial. He then admitted that he could possibly be killed if he admitted what he told the detective was true. Later, during redirect, Duren appeared to admit he was in Cage's car and with Appellants on the date in question or, at the very least answered questions agreeing as to what he told the detective, but he asked to stop his testimony because he was too tired to continue.

Duren eventually testified later in the trial, but his testimony was less than clear.

Even in reviewing a cold record, it is apparent that Duren did not want to testify and was afraid regarding what could happen to him if he identified either Cage or Dunn as the shooter. In this sense, Faylor's testimony simply amplified what was happening at trial. Although we agree with Appellants that the trial court should not have admitted Faylor's opinion that Duren was afraid of Appellants, Duren's own testimony (some of which was erratic) convincingly establishes that he was indeed afraid to testify against Appellants. Therefore, we do not find that Appellants were prejudiced by the admission of Faylor's opinion.[3]

## III

### *SUBSTANTIAL EVIDENCE*

Cage next argues the evidence was insufficient to support his conviction as an aider and abetter for murder and attempted murder. We disagree.

We apply a substantial evidence standard of review to assess the sufficiency of the evidence. We review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence–that is, evidence that is reasonable, credible, and of solid value–from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We ask

---

[3]     Because we determine Appellants were not prejudiced, we reject Cage's claim that his trial counsel was prejudicially ineffective for failing to object on constitutional grounds to Faylor's testimony.

whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the allegations to be true beyond a reasonable doubt. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

"[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) " 'A person aids and abets the commission of a crime when he . . . (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating, or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Hill* (1998) 17 Cal.4th 800, 851.)

"It is important to bear in mind that an aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1117.) Factors relevant to whether a defendant is guilty of aiding and abetting can include his presence at the scene of the crime, companionship, and conduct before and after the offense. (See *People v. Hill*, *supra*, 17 Cal.4th at pp. 851-852; *In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

22

Here, the prosecution presented ample evidence showing Cage knew Dunn intended to shoot Douglas and Payton, and that Cage intended to and did encourage or facilitate Dunn in committing the crimes. Cage and Dunn were members of the same gang, and they had a long standing violent rivalry with Front Hood gang members. A few days before the crimes, Cage and Dunn encountered rival gang member Douglas at a liquor store. Cage said to Dunn, "He's one of them boys." Cage then challenged Douglas by asking "where are you from," and then telling Douglas, "You know where I'm from. I'm from Poccet Hood. They call me Monster." Douglas went about his business and returned to his car. As Douglas was driving, Cage started following him in his car and acted like he was going to hit him. A few days later, when Cage was driving the opposite direction of Douglas, Cage swerved, again acting like he was going to run into Douglas.

The night of the crime, Cage was again driving with Dunn in the front passenger seat. Both were armed with handguns, and Cage knew where Douglas lived. They drove to Douglas's house to "take care of business." Cage and Dunn approached the driveway, and as Cage stood lookout, Dunn continued up the driveway, shooting Douglas and Payton. Cage and Dunn then returned to Cage's car, with guns in their hands, and Duren drove them away.

In addition, expert testimony regarding gangs showed that respect is highly important to gang members and is earned by committing crimes such as assaults, stabbings, and shootings on behalf of the gang. Gang members commit these crimes against people who disrespect them. By committing the crimes in association with one

23

another, Cage and Dunn promoted their reputation, within the gang and in the community.

Thus, substantial evidence established that Cage had the requisite intent to aid and abet Dunn in committing the murder and attempted murder. The Poccet Hood gang members were violent rivals of Front Hood gang member Douglas. Shortly after Douglas disrespected Cage at the liquor store, Cage drove to Douglas's house, and stood armed with a nine-millimeter handgun as lookout while Dunn, who had a .380, did the actual shooting. The two then fled the crime scene together. Based on this evidence, the jury could reasonably conclude that Cage and Dunn were on a mission to kill a rival gang member and his fiancé, and Cage served as the lookout for his fellow gang member.[4]

IV

*STREET TERRORISM JURY INSTRUCTION*

Dunn contends the trial court prejudicially erred in instructing the jury concerning the elements of street terrorism under the February 2013 version of the standard CALCRIM No. 1400 on the ground it did not require the jury to find at least two gang members of the same gang must have participated in the felony offense to find him guilty. Dunn concedes his trial counsel did not object to CALCRIM No. 1400 or request any clarifying instruction.

---

[4]     Cage also contends that if we found the evidence insufficient to support his conviction for murder and attempted murder then we should reverse his conviction for street terrorism as well. Because we find substantial evidence supports Cage's convictions for murder and attempted murder, we need not address his argument that we reverse his street terrorism conviction.

24

By failing to object to or request a specific jury instruction at trial, Dunn forfeited this claim on appeal, unless the claimed error affected Dunn's substantial rights. (See § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) We conclude that Dunn has not shown that the claimed error affected his rights; thus, he has forfeited his claim.

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid.*) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Here the court instructed the jury under former CACLCRIM No. 1400 as follows:

> "The defendants are charged in Count 3 with participating in a
> criminal street gang in violation of Penal Code Section 186.22(a).

25

"To prove that the defendants are guilty of this crime, the People must prove that,

"1. The defendants actively participated in a criminal street gang;

"2. When the defendants participated in the gang, they knew that the members of the gang engage in or have engaged in a pattern of criminal activity; and

"3. That the defendants willfully assisted, furthered, or promoted felonious conduct by members of the gang either by:

"(a) directly and actively committing a felony offense; or (b) aiding and abetting a felony offense.

"Active participation means involvement with a criminal street gang in a way that is more than passive or in name only."

Dunn and Cage committed the crimes in November 2012, and the trial commenced on January 27, 2014. The trial court instructed with the February 2013 version of CALCRIM No. 1400.

In August 2013, the Judicial Council revised the instruction and, as relevant here, added the paragraph, "At least two gang members must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang." (CALCRIM No. 1400 (Aug. 2013 supp.).) In February 2014, the Judicial Council modified the first sentence to read, "At least two members of that same gang must have participated in committing the felony offense." (CALCRIM No. 1400 (2014).) Dunn's claim of error is based on the 2014 version of the instruction.

However, CALCRIM No. 1400, as given in the instant matter, correctly informed the jury that to find Appellants guilty of street terrorism (§ 186.22, subd. (a); count 3), it

26

had to find that Appellants had willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by (1) directly and actively committing a felony offense or (2) aiding and abetting a felony offense. In other words, the word "members" required that each of the Appellants' actions be in connection, in some way, with another gang member. The instruction followed the statutory language for active participation in a criminal street gang.[5] It was correct statement of the law. Accordingly, no instructional error occurred.

Moreover, we are not persuaded by Dunn's argument that the subject jury instruction allowed the jury to convict the Appellants contrary to *People v. Rodriguez* (2012) 55 Cal.4th 1125. In that case, our high court concluded "with section 186.22(a), the Legislature sought to punish gang members who acted in concert with other gang members in committing a felony regardless of whether such felony was gang related." (*Rodriguez, supra*, at p. 1138, italics omitted.) This court followed *Rodriguez* to reverse a defendant's conviction for street terrorism when there was insufficient evidence that the defendant engaged in felonious criminal conduct with a member of the defendant's gang. (*People v. Velasco* (2015) 235 Cal.App.4th 66, 76-78.) We are satisfied that Appellants' convictions for street terrorism do not raise any of the concerns present in *Rodriquez* or *Velasco*.

---

5    Section 186.22, subdivision (a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

Here, the evidence plainly established Dunn committed the crimes in concert with his fellow Poccet Hood gang member Cage. Further, the gang expert explained that the crimes were committed in association with a criminal street gang because Cage and Dunn were both Poccet Hood gang members. As such, we are not concerned that the jury could have convicted Cage and Dunn for street terrorism without finding that they each committed felonious conduct with another member of their gang.

Against this backdrop, even if we were to conclude the instruction given was improper, we would not reverse the Appellants' convictions. Instructional error requires reversal only if it is reasonably probable that the result would have been more favorable had the court given the revised version of CALCRIM No. 1400. (*People v. Lawley* (2002) 27 Cal.4th 102, 161 [failure to give revised version of CALJIC No. 3.18 held harmless under the *Watson* standard].) The evidence overwhelmingly established that both Cage and Dunn committed their felonies in connection with each other and both are members of the same gang. Therefore, it is not reasonably probable Dunn or Cage would have achieved a more favorable result if the court had given the additional paragraph in the revised CALCRIM No. 1400.

V

*APPELLANTS' RESPECTIVE SENTENCES*

Lastly, Appellants contend, and the People correctly concede, the trial court erred by imposing a 15-year minimum parole eligibility period under section 186.22, subdivision (b)(5), on count 2 because the jury did not find that either Dunn or Cage personally used or discharged a firearm in the commission of the offense. We agree.

28

The trial court sentenced Appellants on count 2 to an alternative term of 15 years to life for the attempted, premeditated murder conviction pursuant to the jury finding that the crime was committed in furtherance of a street gang as set forth under section 186.22, subdivision (b)(5). As to Cage, this was tripled by virtue of his two prior strikes, to 45 years to life. As to Dunn, the 15 years to life was doubled because of his prior strike. The trial court also imposed on both Appellants a term of 25 years to life on count 2 for the jury's finding that a principal personally and intentionally discharged a firearm, causing death to the victim.

As Appellants argue, the trial court erred by imposing both the firearm use enhancement under section 12022.53, subdivision (d) and (e)(1), and the gang alternative penalty under section 186.22, subdivision (b)(5), because there was no finding that either Cage or Dunn personally used or personally discharged a firearm. (*People v. Brookfield* (2009) 47 Cal.4th 583, 590 (*Brookfield*).)

Under section 12022.53, subdivision (e)(2), a defendant who does not personally use a firearm cannot be punished under both section 186.22 and section 12022.53. In choosing which of those two provisions to apply, the trial court must, consistent with section 12022.53's subdivision (j), choose the provision that will result in a greater sentence. (*Brookfield*, *supra*, 47 Cal.4th at pp. 596-597.) Here, the court erred by sentencing Appellants under both sections. We thus remand the matter back to the superior court for resentencing.

29

DISPOSITION

The judgment of conviction as to Dunn is affirmed. Regarding Dunn's sentence, the matter is remanded to the superior court with directions to resentence Dunn consistent with this opinion.

The judgment of conviction as to Cage is affirmed. Regarding Cage's sentence, the matter is remanded to the superior court with directions to resentence Cage consistent with this opinion.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


McINTYRE, J.

30